IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOSHUA THORPE,<br><br>                Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>              Defendant. | CASE NO. 1:21-cv-2119<br><br>DISTRICT JUDGE<br>JOHN R. ADAMS<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Joshua Thorpe filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

Thorpe was awarded disability benefits as a child. At his age-18 redetermination, an Administrative Law Judge (ALJ) found that he was no

longer disabled.[1] In July 2019, Thorpe filed applications for Disability Insurance Benefits and Supplemental Security Income alleging a disability onset date of April 1, 2010, and claiming he was disabled due to Becker Muscular Dystrophy and ADHD.[2] Tr. 248, 255, 294. The Social Security Administration denied Thorpe's application and his motion for reconsideration. Tr. 187–90, 194–95. Thorpe then requested a hearing before an ALJ. Tr. 203.

In September 2020, an ALJ held a hearing. Thorpe, who was represented by counsel, and a vocational expert testified. Tr. 32-76. At the hearing, Thorpe changed his alleged onset date to November 1, 2018. Tr. 16, 43. In November 2020, the ALJ issued a written decision finding that Thorpe was not disabled. Tr. 15-27. The ALJ's decision became final on September 7, 2021, when the Social Security Administration's Appeals Council declined further review. Tr. 1-3; *see* 20 C.F.R. § 404.981.

Thorpe filed this action on November 8, 2021. Doc. No. 1. He asserts the following assignment of error:

> Whether the Administrative Law Judge's decision that plaintiff is not disabled pursuant to Listing 11.13 is supported by substantial evidence.

---

[1]    People who are eligible for supplemental security income benefits as children must have their disability redetermined under the rules for disability used for adults. 42 U.S.C. § 1382c(a)(H)(iii); *see* 20 C.F.R. § 416.987.

[2]    "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

Doc. No. 12, p. 1.

**Evidence**

*1.     Personal and vocational evidence*

Thorpe was born in 1997 and was 21 years old on the alleged disability onset date. Tr. 248. He has a high school education and previously worked as a machine operator and quality inspector. Tr. 26, 46.

*2.     Medical evidence[3]*

Thorpe has Becker's muscular dystrophy that was diagnosed when he was a child. He sees an interdisciplinary team of specialists at MetroHealth Hospital for annual visits.

*November 2018 annual visit.* Thorpe's first annual visit during the relevant period was in November 2018. Tr. 501. Thorpe's physician saw no evidence of cardiac dysfunction. Tr. 501. Thorpe reported that he "[s]till falls occasionally" and had not had any serious injuries. Tr. 504. In 2014, Thorpe's physician started him on prednisone[4] because he experienced difficulty walking—he reported doing better overall since then and stated that he doesn't walk as much. Tr. 504.  Thorpe reported that he worked in a machine shop and had leg soreness after he finished his shift and felt tired when he returned home. Tr. 504–05, 511. He said that he "stays on his feet" for three to eight

---

[3]     The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

[4]     Prednisone is steroid used to suppress the immune system and inflammation.

hours a day and "says he can do it." Tr. 504, 511. At work he used a stool and an anti-fatigue mat. Tr. 505.

Thorpe saw Lainie Holman, M.D., at the hospital's muscle clinic. Dr. Holman noted abnormal findings in Thorpe's left ankle and an abnormal gait. Tr. 406. Dr. Holman suggested a custom orthosis to improve Thorpe's ability to bear weight while standing and they discussed frequent sitting at work. Tr. 511. Because Thorpe's prednisone usage put him at risk for developing corticosteroid induced osteoporosis, he saw Hulya Bukulmez, M.D., at the hospital's bone clinic and had yearly bone scans. Tr. 504, 511. Thorpe's bone scan that day showed normal bone age and density. Tr. 512, 396. X-rays of his lower back showed no degenerative changes or acute fractures and "questionable osteopenia."[5] Tr. 653-654. He told Dr. Bukulmez that he worked in a store and "walks all day." Tr. 511. Thorpe also saw Andre Prochoroff, M.D., at the hospital's neuromuscular clinic. Tr. 434. Upon exam, he was able to sit unassisted, had a functional gait, and had slightly decreased strength. Tr. 437. Dr. Prochoroff wrote that Thorpe's physical exam remained stable and that he was still quite active and ambulatory. Tr. 437.

*Consultative exam—physical*. In October 2019, Thorpe saw Dariush Saghafi, M.D., for a consultative exam. Tr. 770-772. Thorpe told Dr. Saghafi that his condition was "becoming more progressive." Tr. 772. He had decreased

---

[5]     Osteopenia is a loss of bone mineral density that causes weaker bones. *See* https://my.clevelandclinic.org/health/diseases/21855-osteopenia (last visited 9/27/2022).

stamina and couldn't walk as long as in the past. Tr. 772. Thorpe said he could "walk/stand" 30 minutes at a time and lift up to 25 pounds. Tr. 770. He still fell two to five times a week and he fell more often when he missed his steroid dose. Tr. 772. During the exam, Thorpe performed air squats by holding onto the exam table. Tr. 770. Dr. Saghafi commented that Thorpe was only able to do three squats before he felt "extremely tired and even winded," was "very tired" within less than 30 seconds of starting the maneuver, and had "mild difficulties coming to the erect position." Tr. 770.

Thorpe's motor exam showed that his muscle tone and bulk in both arms and legs were normal for his age and he had full strength in all areas tested in both arms and legs. Tr. 771-772, 774. Thorpe had intact sensation and reflexes and his range of motion was normal except for his lower back—80 to 90 degrees—due to pain. Tr. 772, 775-776. Dr. Saghafi wrote that Thorpe had a normal gait and arm swing "with predisposition to fall after 350 feet." Tr. 772.

*October 2019 annual visit.* Later in October 2019, Thorpe saw the interdisciplinary team at MetroHealth Hospital. His pulmonary and cardiac function tests were essentially normal and he appeared comfortable standing. Tr. 787, 789, 869. At the muscle clinic he reported "more … leg pain after walking 30 minutes," which "resolve[d] with rest." Tr. 790. Maurice Sholas, M.D., Ph.D., wrote that Thorpe had difficulty walking on his toes and heels and difficulty with his tandem gait. Tr. 791. He moved "well enough to not emergently need a fall plan." Tr. 791.

Thorpe saw Dr. Prochoroff at the neuromuscular clinic and stated that he was "fully ambulatory[], still … falls occasionally," but had had no serious injuries. Tr. 792. He reported pain in both legs during the past three to four years, which typically occurred when he walked for a long time or overexerted himself. Tr. 794. Thorpe's pain was manageable and typically resolved with a five- to ten-minute break. Tr. 794. He sat more at work, was still "very busy," and was able to walk about a mile. Tr. 792. Thorpe reported that his employer was understanding of his condition and gave him breaks as needed. Tr. 892. His pain "rarely interfere[d] with his ability to complete work or stay at his job." Tr. 892. Thorpe reported some muscle discomfort, "no cramping only when pushing," and feeling soreness in his legs when doing more strenuous work. Tr. 792. He had pain if he sat for too long, which typically occurred when he played video games. Tr. 794.

Thorpe was still on prednisone. Tr. 792. Dr. Bukulmez ordered a bone density scan, the results of which were similar to Thorpe's 2018 scan and normal for a person his age. Tr. 831. Upon exam, Dr. Bukulmez found that Thorpe had mild muscle weakness in his legs. Tr. 833.

Thorpe also saw a provider at the hospital's psychology unit and denied any mental health history. Tr. 893. His mental status exam was normal. Tr. 893.

*Consultative exam—mental.* In late January 2020, Thorpe saw Charles Misja, Ph.D., for a consultative psychological exam. Tr. 778. Thorpe said he

6

had not had mental health treatment and reported problems with weakness and stamina. Tr. 778. He said he was unsure whether he would ever be able to live independently but intended to make a plan to eventually do that. Tr. 779. Thorpe also reported that he had considered going to school for drafting and design, which was "something that doesn't require standing[.]" Tr. 779. He said that he took breaks at work and missed a lot of days because of pain. Tr. 779. And he had difficulty standing or sitting for long periods of time. Tr. 778. At work, Thorpe understood his assigned tasks, did not need much supervision after his initial training, and found it "generally pretty easy" to learn what he needed to do. Tr. 779. At home, he only showered about three times a week because the shower is in his home's basement and he had difficultly using stairs. Tr. 779. Dr. Misja observed that Thorpe walked into the exam room with an unremarkable gait. Tr. 778.

Thorpe's mental status exam was normal. Tr. 779. Dr. Misja wrote that Thorpe presented with ADHD but did not have any diagnosable mental disorders. Tr. 779. He was "probably functioning in the average range of intelligence" and his insight and judgment were good. Tr. 779. Dr. Misja commented that, when asked how he coped with his muscular dystrophy, Thorpe "responded in a matter-of-fact fashion stating that he sometimes gets down but has learned to live with it and focuses on the positive." Tr. 778, 779. He wrote that Thorpe was "capable of managing any funds assigned to him" if awarded disability benefits and that he was "an excellent candidate for

7

vocational rehabilitation." Tr. 780. Dr. Misja found that Thorpe had minimal functional limits except in the area of responding appropriately to work pressures in a work setting. Tr. 780. In that setting, his problems were "likely to be in the intermediate to severe range" because of his reported pain and difficulty standing and sitting for extended periods of time. Tr. 780.

In August 2020, Thorpe's mother called his doctor's office and requested a cane. Tr. 917. The office placed an order for a cane. Tr. 917.

*September 2020 annual visit*. Thorpe saw the interdisciplinary team at MetroHealth Hospital again in September 2020. His lungs and heart were normal. Tr. 908-909. He saw Dr. Sholas at the muscle clinic, reported having more falls, and said that he had begun using a cane for "more support." Tr. 910. Thorpe stated that he walked, did not run or jump, and that his ability to use "stairs [was] poor." Tr. 910. His leg pain resolved with nonsteroidal anti-inflammatory medication. Tr. 910. Upon exam, Dr. Sholas observed that Thorpe had proximal muscle weakness and an abnormal gait—it was "[w]ide based"—and he had difficulty with a tandem gait. Tr. 911. Dr. Sholas's impression was that Thorpe had generalized muscle weakness and impairment in mobility and activities of daily living. Tr. 911. He recommended physical and occupational therapy, discussed the use of a wheelchair, and wrote that a single point cane was inadequate. Tr. 912.

In the bone clinic, Thorpe reported back pain, which he attributed to muscle pains, and falling more often. Tr. 913. His bone density scan results

8

were in the expected range for his age and had not changed much from 2019. Tr. 913. An exam of his upper and lower extremities revealed mild muscle weakness—his strength was rated 4 out of 5. Tr. 914.

During his appointment with a social worker, Thorpe reported that he stopped working in March 2020 due to concerns about Covid-19 and said that he planned to return to work when he felt safe. Tr. 906-907. He was considering additional job training in gunsmithing. Tr. 907. He walked with a cane, remained independent in his daily activities, did not require "home health or waiver services," had his own car, and was able to drive. Tr. 907. Thorpe enjoyed playing video games and spending time on his computer. Tr. 907. He said that he was coping well with his muscular dystrophy and denied any mental health history other than ADHD. Tr. 907.

### 3. Function report

In September 2019, Thorpe completed a function report. Tr. 305-312. He wrote that, due to his muscular dystrophy, he did not think he could work full time and explained that it was hard to walk, stand, lift, and reach. Tr. 305. Thorpe's upper arms were weak at times. Tr. 310. Thorpe reported losing his balance and being more tired than in the past. Tr. 305. His illness affected his ability to squat, bend, kneel, climb stairs, and use his hands. Tr. 310. Thorpe said that he could walk for about ten minutes before he needed to rest. Tr. 310. He could drive and go out alone, had no problems playing games, watching TV, or getting along with others, and had a normal ability to handle stress and

9

changes in routine. Tr. 311. Thorpe thought he could manage his own finances. Tr. 308.

### 4.    *State agency opinions*[6]

In November 2019, James Greco, M.D., reviewed Thorpe's record; considered Listing 11.13, muscular dystrophy; and found that Thorpe did not satisfy that listing.[7] Tr. 135. Regarding his residual functional capacity (RFC),[8] Dr. Greco found that Thorpe could occasionally lift or carry ten pounds and frequently lift or carry less than ten pounds; stand or walk for slightly less than two hours; sit for about six hours during a normal eight-hour workday; frequently balance; and occasionally climb ramps and stairs. Tr. 136–38. Dr.

---

[6]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[7]    The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each *body system* section has an *Introduction*, which contains information relevant to that system, and a *Category of Impairments*, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id.*; 20 C.F.R. § 404.1525.

[8]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

Greco also found that Thorpe could stoop, kneel, crouch, and crawl but could never climb ladders, ropes, or scaffolds. Tr. 136-138. In May 2020, W. Scott Bolz, M.D., adopted Dr. Greco's findings except that he found that Thorpe could frequently stoop, kneel, crouch, and crawl. Tr. 164, 166.

In February 2020, Aracelis Rivera, PsyD., reviewed Thorpe's record and found that he did not have a severe mental impairment. Tr. 134. In May 2020, Irma Johnston, Psy.D., adopted Dr. Rivera's findings. Tr. 164.

     *5.     Hearing testimony*

Thorpe, who was represented by counsel, testified at an administrative hearing held in September 2020. He stated that he started working part-time in June 2018 and stopped in March 2020 per his doctor's orders because he was high-risk for Covid due to his steroid use. Tr. 45, 47. Before March 2020, Thorpe worked 15 hours a week, in three, five-hour shifts. Tr. 46, 51. He used to work more hours but was forced to decrease his hours when he started getting fatigued more easily and experiencing pain in the morning. Tr. 46. Even when working only 15 hours per week, he missed one to two days of work a week because of fatigue and muscle pain. Tr. 48. Thorpe's employer let him take breaks as needed during the day. Tr. 49. So Thorpe took five to ten breaks each day. Tr. 49. His breaks lasted for "a couple of minutes," during which time he would sit and rest his back or legs. Tr. 51.

When asked to compare his current condition to his condition about two years ago, Thorpe stated that now he felt fatigued sooner and he fell more often

because of leg weakness. Tr. 49. He fell about once or twice a week and, at most, six times a day. Tr. 49-50. Thorpe's falls were random and caused by fatigue and his knees giving out. Tr. 50. Thorpe could walk about 300 to 400 feet at a slow pace before feeling fatigued. Tr. 50-51. He hadn't been injured from falling, however. Tr. 50.

Thorpe started using a cane about two to three weeks before his administrative hearing, after he fell six times in one day. Tr. 54. He started using the cane on his own and then asked for a prescription, which he received at his annual visit at MetroHealth two days before his hearing. Tr. 54. Also at that visit, his physical therapist recommended that Thorpe be prescribed a wheelchair. Tr. 54-55. Thorpe clarified that he was scheduled to have a follow-up appointment one month after his hearing, which was scheduled "to figure out what we're going to do exactly. So, nothing has been prescribed yet or in the works yet." Tr. 55.

Thorpe testified that he has bad balance issues and is "real wobbly when standing still." Tr. 56. His muscular dystrophy affected his upper extremities, too—he had issues manipulating small objects "every now and again." Tr. 56. Thorpe sometimes had problems standing up. Tr. 57. His father removed an old porch at Thorpe's home and rebuilt it with a ramp for Thorpe and his brother. Tr. 57. Thorpe testified that he put off showering because the shower in his home is in the basement and he has difficulty with stairs. Tr. 58. He was able to go down stairs on his own, however. Tr. 58. Thorpe helped a little with

12

household chores—he became fatigued easily and usually ended up doing the chores while sitting down. Tr. 58.

The ALJ stated during the hearing that Thorpe had no past relevant work. Tr. 59. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Thorpe could perform Thorpe's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below.[9] Tr. 60-66. The vocational expert answered that such an individual could perform the following representative jobs in the economy: order clerk, charge-account clerk, and electronics inspector. Tr. 65-66.

**The ALJ's Decision**

The ALJ issued the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2021.

2. The claimant has not engaged in substantial gainful activity since October 19, 2018 (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: Becker's muscular dystrophy, attention deficit hyperactivity disorder (ADHD) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of

---

[9]     A vocational expert's testimony "is directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what she 'can and cannot do,' there exist a significant number of employment opportunities for her in the regional and national economies." *Webb*, 368 F.3d at 633. The vocational expert considers the claimant's RFC, "'age, education, and work experience' and assesses whether the claimant 'can make an adjustment to other work.'" *Id*. (quoting 20 C.F.R. § 416.920(a)(4)(v)).

impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to  perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except for the following limitations. The claimant can lift and carry up to 10 pounds occasionally and less than 10 pounds frequently. The claimant can stand and walk for up to two hours per eight-hour workday, and can sit for up to six hours per eight-hour workday. The claimant must alternate to sitting  for  five minutes after every 30 minutes of standing or walking. The claimant can push and pull as much as he can lift and carry. He can operate foot controls occasionally bilaterally. He can operate hand controls occasionally bilaterally. The claimant can perform occasionally bilateral overhead reaching. For all other reaching, he can reach occasionally to the left and occasionally to the right. He can handle items frequently with the bilateral hands. He can perform frequent fingering and feeling with the bilateral upper extremities. He can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can work at unprotected heights occasionally, never around moving mechanical parts, and in vibration occasionally. The claimant is able to perform simple, routine, and repetitive tasks, but not at a production-rate pace (e.g. assembly line work). The claimant is able to perform simple work-related decisions.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [i]n 1997 and was 12 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568

and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 19, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 18–27.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the

15

next step.

4.      What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.      Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d

16

679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

### Discussion

Thorpe argues that the ALJ's analysis of Listing 11.13, muscular dystrophy, is flawed and unsupported by substantial evidence. Doc. No. 12, pp. 7-8.

At step three of the disability evaluation process, a claimant will be found disabled if his or her impairments meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that any condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress*

17

*v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Se*c., 424 Fed. App'x 411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id.* (emphasis in original). There is no heightened articulation standard at Step Three. *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. 2006).

Listing 11.13, Muscular dystrophy, is characterized by either:

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or

B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:

1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
2. Interacting with others (see 11.00G3b(ii)); or
3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. § Pt. 404, Subpt. P, App. 1.[10]

The ALJ found that Thorpe did not satisfy Listing 11.13, and explained,

…. No treating or examining physician has mentioned findings regarding the claimant's physical impairments equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments.

There was no evidence of the requisite physical examination findings, diagnostic studies, laboratory results, or deficits in functioning to establish a listing-level physical impairment during this period. 11.13 requires disorganization of motor function in two extremities resulting in extreme limitation in the ability to stand up from a seated position, balance while standing and walking, or perform manipulative activities with the upper extremities.

Although there was some evidence of worsening since the previous ALJ decision, the evidence fails to show the severity of the claimant's muscular dystrophy yet meets these criteria. The claimant admitted to only mild difficulties with handling objects arising recently, but there was no evidence that he was unable to manipulate objects for his routine daily activities. The claimant has not been prescribed a two-handed assistive device for standing and walking, as is required to show disorganization of motor functioning. The objective evidence demonstrates that he discussed possible manual wheelchair use with his muscle specialist physician during his recent yearly interdisciplinary follow-up, but he testified that he decided to wait after the conclusion of that examination. The discussion of the wheelchair arose primarily due to the claimant's subjective reporting of recent falls, not due to any significant progression in the claimant's strength or sensation deficits. The claimant had only begun using a cane in August 2020, per a call-in note from his mother requesting a prescription. Physical examinations did not reveal any significant decline in strength, sensation, balance, or coordination since prior office visits, and a new medication was added to support bone density but no other significant adjustments were made, suggesting overall stability of his disease process at the most recent evaluation in September 2020. (Exhibit C10F). The claimant testified that he feels unsteady after walking about 300 or 400 feet, but there was

---

[10]    This version of Listing 11.13 was in effect at the time of the ALJ's November 2020 decision. The 11.00 subsections are the definitions for the relevant words and phrases each citation follows.

no indication that he could no longer rise from a seated position or maintain balance while standing or walking for very short intervals. This fails to establish "extreme limitations" as required by the listing.

Tr. 19.

Thorpe argues that the ALJ's reasons are not supported by substantial evidence and complains that the ALJ only addressed Listing 11.13A and not 11.13B. Doc. No. 12, pp. 8-9. He does not explain why he believes the ALJ's explanation as to part A is faulty.[11] I thus only address his argument that the ALJ did not address Listing 11.13B.

While true that the ALJ did not discuss Listing 11.13B in her decision, the ALJ's failure to do so is reversible error only if the ALJ failed to make sufficient findings elsewhere in her decision, or if Thorpe can show that he satisfies the criteria of Listing 11.13B. *See Forrest v. Comm'r of Soc. Sec.*, 591 Fed.App'x 359, 366 (6th Cir. 2014) (citing *Bledsoe v. Barnhart*, 165 Fed.App'x 408, 411 (6th Cir. 2006); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed.App'x 411, 416 (6th Cir. 2011)). Here, the ALJ made sufficient findings elsewhere in her decision and Thorpe can't show that he satisfies the criteria of Listing 11.13B.

To satisfy Listing 11.13B, Thorpe must show that he has a "marked limitation" in physical functioning under 11.00G2. That section provides:

…Although we do not require the use of such a scale, "marked" would be the fourth point on a five-point scale consisting of no limitation, mild limitation, moderate limitation, marked limitation, and extreme

---

[11]    *See also* Doc. No. 14, p. 13 (Defendant's brief stating that Thorpe does not challenge the ALJ's analysis of whether he met or equaled Listing 11.13A). Thorpe did not file a reply brief objecting to Defendant's characterization of the scope of his challenge.

limitation. We consider the nature and overall degree of interference with your functioning. The term "marked" does not require that you must be confined to bed, hospitalized, or in a nursing home.

a. Marked limitation and physical functioning. For this criterion, a marked limitation means that, due to the signs and symptoms of your neurological disorder, you are seriously limited in the ability to independently initiate, sustain, and complete work-related physical activities (see 11.00G3). You may have a marked limitation in your physical functioning when your neurological disease process causes persistent or intermittent symptoms that affect your abilities to independently initiate, sustain, and complete work-related activities, such as standing, balancing, walking, using both upper extremities for fine and gross movements, or results in limitations in using one upper and one lower extremity. The persistent and intermittent symptoms must result in a serious limitation in your ability to do a task or activity on a sustained basis. We do not define "marked" by a specific number of different physical activities or tasks that demonstrate your ability, but by the overall effects of your neurological symptoms on your ability to perform such physical activities on a consistent and sustained basis. You need not be totally precluded from performing a function or activity to have a marked limitation, as long as the degree of limitation seriously limits your ability to independently initiate, sustain, and complete work-related physical activities.

20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2.

Thorpe contends that physical exam findings and his testimony "unite to prove that [he] has marked impairment in physical functioning." Doc. No. 12, pp. 9-10. He recounts his testimony that, he believes, supports his argument that he has marked limitations in physical functioning. Doc. No. 12, p. 11. But the ALJ found that Thorpe's testimony regarding his symptoms was not consistent with the evidence. The ALJ explained that Thorpe's treatment throughout the relevant period remained the same—he continued to see his team of specialists only for annual visits and his treatment did not change— and that Thorpe's course of treatment was inconsistent with Thorpe's

allegations of severe disease progression. Tr. 22-23. Thorpe does not challenge the ALJ's evaluation of his testimony or his reports of symptoms. So his testimony is not evidence showing he has a marked impairment in physical functioning.

Thorpe doesn't cite physical exam findings that show he has a marked impairment in physical functioning, either. He cites his own reports of symptoms to his doctors, but his reports of symptoms are not physical exam findings. Doc. No. 12, p. 10 (Thorpe detailing his reports of symptoms to Dr. Prochoroff and the consultative examiner, Dr. Saghafi). He cites Dr. Sholas's observation that he had difficulty walking on his heels and toes and that he had a tandem gait and generalized muscle weakness in September 2020. Doc. No. 12, p. 10, Tr. 911. But the ALJ accurately stated that Dr. Bukulmez found that Thorpe only had mild weakness that day, rating his strength 4 out of 5. Tr. 23 (citing Tr. 914). He cites Dr. Saghafi's observation that he was "extremely tired and even winded" after performing three air squats and his opinion that Thorpe had proximal leg strength limitation and a predisposition to falling after walking 350 feet. Doc. No. 12, p. 10, Tr. 772. But the ALJ found that Dr. Saghafi's opinion about Thorpe's proximal leg strength was inconsistent with his own exam findings showing that Thorpe had normal strength, range of motion, sensation, and a normal gait. Tr. 24, Tr. 771-772. And the ALJ observed that Dr. Saghafi's opinion "relied heavily on [Thorpe's] subjective reporting, as it was a reiteration of the claimant's reported

limitations." Tr. 24. Thorpe does not challenge the ALJ's reasoning or conclusions as to any of these findings. He does not show that he had a marked impairment in physical functioning.

Thorpe argues that the ALJ erred because she did not discuss his use of a cane or his discussions about a wheelchair "in the context of" listing 11.13B. Doc No. 12, p. 12. He does not explain why the ALJ should have discussed a cane or a wheelchair again after having already discussed a cane and wheelchair when assessing Listing 11.13A. Tr. 19, 22, 23. As to Listing 11.13A, the ALJ wrote:

> The claimant has not been prescribed a two-handed assistive device for standing and walking, as is required to show disorganization of motor functioning. The objective evidence demonstrates that he discussed possible manual wheelchair use with his muscle specialist physician during his recent yearly interdisciplinary follow-up, but he testified that he decided to wait after the conclusion of that examination. The discussion of the wheelchair arose primarily due to the claimant's subjective reporting of recent falls, not due to any significant progression in the claimant's strength or sensation deficits. The claimant had only begun using a cane in August 2020, per a call-in note from his mother requesting a prescription. Physical examinations did not reveal any significant decline in strength, sensation, balance, or coordination since prior office visits, and a new medication was added to support bone density but no other significant adjustments were made, suggesting overall stability of his disease process at the most recent evaluation in September 2020. (Exhibit C10F).

Tr. 19.

Thorpe alleges "inaccura[cy]" in the ALJ's finding "that the prescription of the wheelchair was not due to any progression in his strength or sensation deficits." Doc. No. 12, p. 12. Thorpe is mistaken. First, as the ALJ stated, Thorpe was not prescribed a wheelchair. Next, Thorpe cites his gait

abnormalities at his September 2020 visit to support his claimed progressive weakness (Doc. No. 12, p. 12, Tr. 911), but Thorpe had gait abnormalities at his 2018 and 2019 annual visits, too. Tr. 406, 437, 791. And, elsewhere in the decision, the ALJ acknowledged that at his September 2020 annual visit, Thorpe's gait and his ability to rise from the ground had worsened. Tr. 23. But the ALJ found that he still retained functional, 4-out-of-5 strength in his upper and lower extremities at that visit. Tr. 23. The ALJ commented that Dr. Bukulmez wrote that Thorpe "maintain[ed] himself well and walked with a foot-ankle orthotic … despite some discussion with another physician on that date regarding possible wheelchair use in the future." Tr. 23 (citing Tr. 914). Thorpe does not dispute this evidence or articulate how the ALJ's findings are "inaccurate."

Finally, to satisfy Listing 11.13B, Thorpe must also show that he has a marked limitation in one of four areas of mental functioning. The ALJ considered those four areas of functioning when she considered whether Thorpe satisfied Listing 12.11, neurodevelopmental disorders. Tr. 19. Listing 11.13B and Listing 12.11 use the same four functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Thorpe argues that he has a "marked" impairment in the domain of adapting or managing oneself, (Doc. 12, p. 13) but the ALJ disagreed:

> As for adapting or managing oneself, the claimant has experienced a mild limitation. The claimant makes decisions on his own behalf regarding work, his finances, and his medical care. He routinely presented with intact judgment and insight. He was capable of managing his selfcare independently within the bounds of his physical limitations. He stated at the hearing that he sometimes delays bathing, but he related this to the fact that his shower is in his basement, rather than decreased motivation or other mental symptoms. The claimant did not report any mental difficulties in managing the demands of his recent employment or problems tolerating work stress.

Tr. 20. Thorpe does not explain why this finding is not supported by substantial evidence.

Thorpe asserts that he has "significant limitations in responding appropriately and tolerating work-related stress and pressure." Doc. No. 12, p. 13. He submits that Dr. Misja, the consultative examiner, "noted [that it] is not clear whether [Thorpe] can ever handle living on his own." Doc. No. 12, p. 13.[12] But the ALJ considered, and rejected, Dr. Misja's opinion (Tr. 24-25), and Thorpe does not challenge that portion of the ALJ's decision. He has thus not shown that the ALJ's decision is unsupported by substantial evidence.

Thorpe has thus not shown that the ALJ failed to make sufficient findings with respect to Listing 11.13B in her decision as a whole. He has not shown that his condition satisfies the criteria in Listing 11.13B. As a result, I find that the Commissioner's decision should be affirmed. *See Forrest*, 591 Fed. App'x at 366.

---

[12]     Dr. Misja reported what Thorpe had told him—"He stated he's not sure if he'll ever live independently…" Tr. 780. Dr. Misja did not question whether Thorpe could live independently.

**Conclusion**

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.

Date: September 27, 2022

*/s/ James E. Grimes Jr.*

James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).